In the Matter of GEORGIA STEEL, INC., d/b/a Eastern Crane & Equipment, d/b/a Plate Services, d/b/a Georgia Structurals, and d/b/a Quickwork, Debtor.

J. Coleman TIDWELL, Trustee, Plaintiff,

v.

ATLANTA GAS LIGHT COMPANY, Defendant.

Bankruptcy No. 81–50966–Mac.
Adv. No. 83–5010.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

March 21, 1984.

---

Duncan A. Roush, Kilpatrick & Cody, Atlanta, Ga., for trustee.

Mary Mendel Katz, Harris, Watkins, Davis & Chambless, Macon, Ga., for Atlanta Gas Light Co.

Ward Stone, Jr., Kaplan, Thomason & Stone, P.A., Macon, Ga., for debtor.

Ed S. Sell, III, Sell & Melton, Macon, Ga., for The Citizens & Southern Nat. Bank.

Lillian H. Lockary, Asst. U.S. Atty., Macon, Ga., for I.R.S.

## MEMORANDUM OPINION ON COMPLAINT TO AVOID PREFERENTIAL TRANSFERS

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

### STATEMENT OF THE CASE

On September 3, 1981, Georgia Steel, Inc., d/b/a Eastern Crane & Equipment, d/b/a Plate Services, d/b/a Georgia Structurals, and d/b/a Quickwork, Debtor, filed with this Court its petition under Chapter 11 of the United States Bankruptcy Code. On September 14, 1982, Atlanta Gas Light Company filed an application in Debtor's Chapter 11 case for the payment of an administrative expense in the amount of $12,823.82. Debtor objected to the application on the ground that Atlanta Gas had received certain preferential transfers from Debtor. By order dated October 26, 1982, the Court allowed Atlanta Gas' claim for an administrative expense in its entirety, but reserved ruling on disbursement of the administrative expense until ruling upon the alleged preferential transfers. ·

On October 29, 1982, Debtor's Chapter 11 case was converted by the Court to Chapter 7 of the United States Bankruptcy Code, and J. Coleman Tidwell was appointed trustee (hereinafter Trustee). Before the Court is the "Complaint to Avoid Preferential Transfers" filed by the Trustee on January 10, 1983. The complaint alleges that Atlanta Gas received preferential transfers in the total amount of $6,624.75, which transfers are avoidable under the provisions of 11 U.S.C.A. § 547 (West 1979). The complaint came on for trial, and the Court, having considered the evidence presented at trial and the briefs of counsel, now publishes its findings of fact and conclusions of law.

### FINDINGS OF FACT

Debtor maintained three separate accounts with Atlanta Gas. Account number 01302–2840–0–7 was maintained for Debtor's "plate division" (hereinafter plate division account). Account number 22302–1195–0–6 was maintained for Debtor's "administrative division" (hereinafter administrative division account), and account number 01302–3505–0–2 was maintained for Debtor's "crane division" (hereinafter crane division account).

On June 4, 1981, Debtor drew a check made payable to Atlanta Gas in the amount of $3,000.00. The check specified that $386.10 was for the crane division account, and that $2,613.90 was for the administrative division account. On June 5, 1981, Atlanta Gas credited Debtor's accounts in accordance with Debtor's instructions. The check was paid by Debtor's bank on June 9, 1981.

On July 7, 1981, Debtor drew a check made payable to Atlanta Gas in the amount of $1,000.00. The check specified that $369.66 was for Debtor's plate division account and $630.34 was for Debtor's administrative division account. The accounts were credited, as Debtor instructed, on July 8, 1981, and the check was paid by Debtor's bank on July 9, 1981.

On August 14, 1981, Debtor drew a check payable to Atlanta Gas in the amount of $2,624.75 and delivered the check to Atlanta Gas, specifying that the entire amount was for the administrative division account. The entire payment was credited to the administrative division account on August 17, 1981, and the check was paid by Debtor's bank on either August 18 or August 19, 1981.

It is the total of these three checks, $6,624.75, that the Trustee seeks to recover as preferential transfers.

Debtor's transactions with Atlanta Gas that are relevant to this adversary proceeding are set forth in Appendix A to this opinion.

## CONCLUSIONS OF LAW

The Trustee asserts that the payments by Debtor to Atlanta Gas are preferential transfers within the meaning of section 547(b) of the Bankruptcy Code and, as such, are subject to the avoidance power of the Trustee. Section 547(b) provides:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

> (i) was an insider; and
> (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 1979).

The parties do not dispute that the July and August payments satisfy all of the requirements of section 547(b) and therefore are preferential transfers within the meaning of that section. Atlanta Gas, however, contends that the check dated June 4, 1981, does not fall within the ninety-day preference period of section 547(b)(4). It is stipulated that the June check satisfies all other requirements of a preference under section 547(b).

Debtor's Chapter 11 case was filed on September 3, 1981, and the ninety-day preference period thus starts on June 5, 1981. Atlanta Gas argues that the June 4, 1981, check was written and delivered to Atlanta Gas on June 4, 1981, and that June 4, 1981, is the controlling date for purposes of section 547(b)(4). The Trustee asserts that the day the check was paid by the drawee bank should control.

The majority of courts faced with the situation where, as in this case, the check was delivered outside the preference period, and subsequently honored during the preference period, have concluded that it is the date that the drawee bank honors the check which determines when the transfer was made for purposes of section 547(b)(4). *See, e.g., Artesani v. Travco Plastics Co. (In re Super Market Distributors Corp.)*, 25 B.R. 63, 9 Bankr.Ct. Dec. 1155 (Bkrtcy. D.Mass.1982); *Itule v. Luhr Jensen & Sons, Inc. (In re Sportsco, Inc.)*, 12 B.R. 34, 7 Bankr.Ct. Dec. 1025 (Bkrtcy.D.Ariz.

1981). *See also Nicholson v. First Investment Co.*, 705 F.2d 410 (11th Cir.1983) (under the Bankruptcy Act, a preference occurs when a check is honored by the drawee bank, not when it is delivered); *Harris v. Harbin Lumber Co. (In re Ellison)*, 31 B.R. 545 (Bkrtcy.M.D.Ga.1983).

This majority view is based upon section 547(e) of the Bankruptcy Code and section 3–409(1) of the Uniform Commercial Code.[1] 11 U.S.C.A. § 547(e)(1)(B) (West 1979) provides: "[A] transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." O.C.G.A. § 11–3–409(1) (Michie 1982) provides: "A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it." Since funds in the drawee bank could be garnished by a contract creditor prior to the honoring of the check, a transfer under section 547(e)(1)(B) does not occur until the check is honored by the drawee bank. *See Nicholson*, 705 F.2d at 413; *In re Super Market Distributors Corp.*, 25 B.R. at 64–65, 9 Bankr.Ct. Dec. at 1156; *In re Duffy*, 3 B.R. 263, 265, 6 Bankr.Ct. Dec. 88, 89, 1 Collier Bankr.Cas.2d 641, 643 (Bkrtcy.S.D. N.Y.1980). Moreover, the date that the check was honored should control in determining whether there was a preferential transfer because that is when the debtor's estate is depleted. *Nicholson*, 705 F.2d at 413. *See also Gilbert v. First National Bank*, 633 F.2d 686 (5th Cir.1980), *cert. denied*, 454 U.S. 825, 102 S.Ct. 114, 70 L.Ed.2d 99 (1981); 4 Collier on Bankruptcy ¶ 547.21 (15th ed. 1983).

Atlanta Gas cites to the Court the case of *Shamrock Golf Co. v. Richcraft, Inc.*, 680 F.2d 645 (9th Cir.1982), in which it was held that a preferential transfer under the former Bankruptcy Act[2] is determined as of the date the check is delivered to the transferee. In *Shamrock*, the court relied on the legislative history of section 547 of the Bankruptcy Code, which provides: "Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2)." 124 Cong.Rec. H11,097 (Sept. 28, 1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787, 6436, 6457 (remarks of Rep. Don Edwards). The *Shamrock* court noted that this legislative history addresses the contemporaneous exchange and ordinary course of business exceptions found in subsections (c)(1) and (c)(2) of section 547, but concluded there was no reason why the same reasoning should not be determinative of whether a transfer occurred within the four-month preference period of the Bankruptcy Act. For the reasons previously and hereinafter stated, this Court declines to follow *Shamrock*.

The legislative history of section 547 further states:

The first exception is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous," and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3–503(2)(a), that will amount to a transfer that is "in fact substantially contemporaneous."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5963, 6329. The legislative history of section 547 states that a check is a "transfer" when delivered, but this legislative history clearly addresses the contemporaneous exchange exception of subsec-

---

**1.** Section 3–409(1) of the Uniform Commercial Code is adopted in Georgia, O.C.G.A. § 11–3–409(1) (Michie 1982).

**2.** Law of July 1, 1898, ch. 541, § 60, 30 Stat. 562 as amended (repealed 1979).

tion (c)(1). The legislative history notes that normally a check is a credit transaction. In subsection (c)(1), Congress sought to encourage the transacting of business with distressed businesses and therefore provided the contemporaneous exchange exception. *See Philadelphia Light Supply Co. v. B.R.K. Electronics (In re Philadelphia Light Supply Co.),* 33 B.R. 734, 11 Bankr.Ct. Dec. 284 (Bkrtcy.E.D.Pa.1983). As an extension of Congress' policy, it is logical that, in applying subsection (c)(1), the date the check is presented to the creditor should control. If it was necessary for a creditor to wait for the check to clear the drawee bank, the creditor's transacting of business with the distressed business would be delayed. Such delay is clearly not in the interest of a distressed business, and for the purposes of section (c)(1), the Court concludes that Congress intended to create an exception to the general rule that a check is not a transfer until it is honored by the drawee bank.

Under subsection (c)(2), the intent of the parties is the relevant concern. "The purpose [of section 547(c)(2) ] is to leave undisturbed normal financial relations...." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6329. In the normal course of business affairs, a creditor considers himself paid at the time a check is delivered. To hold, for the purposes of subsection (c)(2), that a transfer occurs at the time a check is honored could disrupt the normal business relations of a distressed business.[3]

■ The court concludes that although Congress intended for the date of delivery to control in applying the exceptions under subsections (c)(1) and (c)(2), it did not intend for the date of delivery to control in determining whether a transfer falls within the preference period under section 547(b). Subsections (c)(1) and (c)(2) are designed to encourage creditors to deal with distressed business and to protect ordinary business transactions, while section 547(b) addresses

the depletion of the debtor's estate. Accordingly, the Court holds that the June 1981 transfer occurred on June 9, 1981, the day the check was honored by the drawee bank. The transfer thus occurred within the ninety-day preference period.

Having determined that all three checks constitute preferential transfers under section 547(b), the Court now turns to the contention of Atlanta Gas that the payments are excepted from the workings of section 547(b) by subsections (c)(2) and (c)(4) of section 547. Those subsections provide:

> (c) The trustee may not avoid under this section a transfer—
>
> . . . .
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made not later than 45 days after such debt was incurred;
>
> (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (D) made according to ordinary business terms;
>
> . . . .
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C.A. § 547(c)(2), (4) (West 1979).

The Court first will address subsection (c)(2). The Trustee stipulates that the payments to Atlanta Gas were made in the ordinary course of business of Atlanta Gas and Debtor. The Court is further of the opinion that Debtor's debts to Atlanta Gas

**3.** For example, creditors could require payments by cash or certified checks to avoid the possibility that an ordinary check would be honored outside the forty-five-day period.

were incurred in the ordinary course of Debtor's business. The Court now must determine whether the payments were made not later than forty-five days after the debts were incurred.

▉ The Trustee argues that for purposes of section 547(c)(2), a debt is incurred when services are rendered or when the debtor receives a property interest in goods received. The Trustee thus argues that the debts to Atlanta Gas were incurred when Debtor received gas through Atlanta Gas' pipelines. Generally, debts are "incurred" for purposes of subsection (c)(2) at the time the debtor becomes obligated to pay, not when the creditor bills the debtor. Thus, as a general rule, debts are incurred when goods are delivered or services performed. *Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.)*, 695 F.2d 833 (5th Cir.1983). If the date of the billing was used, it would allow a creditor to determine when the debt was incurred, thus allowing a creditor who is aware of a debtor's possible slide into bankruptcy to secure preferential treatment by timing his bill. *Id.* at 837. *See also Barash v. Public Finance Corp.*, 658 F.2d 504 (7th Cir.1981) (debts incurred when recipient is legally obligated to pay); *Trauner v. Stephenson Associates, Inc. (In re Valles Mechanical Industries, Inc.)*, 20 B.R. 350, 9 Bankr.Ct. Dec. 334, 6 Collier Bankr.Cas.2d 859 (Bkrtcy.N.D.Ga.1982) (debt is incurred when goods or services received, not when bill sent).

Collier on Bankruptcy expresses a similar view:

> The determination of when a debt is actually "incurred" is critical. One view is that the debt is not incurred until an invoice is sent or demand for payment is made. The probably better view is that the debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt. Thus if goods are identified for shipment, unless the special agreement otherwise provides, the debtor has a special property interest and the debt is "incurred" . . . .

4 Collier on Bankruptcy ¶ 547.38 (15th ed. 1983).

Certain courts, however, have reached a different result when confronted with utility bills. In *Thomas W. Garland, Inc. v. Union Electric Co. (In re Thomas W. Garland, Inc.)*, 19 B.R. 920, 8 Bankr.Ct. Dec. 1357 (Bkrtcy.E.D.Mo.1982), the defendant supplied electricity to the debtor, and the debtor sought to recover, as preferential, certain payments made by the debtor to the defendant. The court noted the general rule that debts are incurred when the services are rendered, but held that debts for electricity were incurred, for purposes of section 547(c)(2), at the time the meter was read. In reaching its decision, the court noted the practical impossibility of measuring the consumption of electricity without reading the meter.

A similar decision was reached in *Tidwell Printing, Inc. v. Georgia Power Co. (In re Tidwell Printing, Inc.)*, No. 182-00247 (Adv.Proc. No. 182-0109) (Bkrtcy.S.D.Ga. Oct. 6, 1982), *aff'd*, Civ. No. 182-311 (S.D. Ga. Feb. 3, 1984). In that case, the court found that a utility debt was incurred at the time the meter was read, noting that the debt could not be incurred until it could be computed. The court reasoned that since Public Service Commission regulation E.5 prohibited a customer from being billed until his meter was actually read, no debt was incurred until that time.

This Court is of the opinion that Debtor's debt to Atlanta Gas was incurred, within the meaning of section 547(c)(2), at the time the meters were read. The legislative history of section 547(c)(2) provides: "The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6329. In this case, there is no unusual action. Rather, there is the routine reading of a

meter and the payment of a utility bill. While it is true Debtor was obligated to pay for the gas once it was delivered, Debtor could not pay its bill in the ordinary course of its business until the meters were read and the debts determined. Congress, in enacting section 547(c)(2), surely did not consider the unique billing systems of utility companies. The evidence is that Atlanta Gas reads meters monthly, and that it takes approximately ten days after the reading for the customer to be mailed his bill. This is not the unusual activity that Congress intended to address in section 547(c)(2).

Moreover, the Court is concerned with practical problems associated with the Trustee's argument. There is no way to accurately determine the amount of gas consumed in any given day. This is not the case of identifiable goods shipped to a debtor. The only record of gas consumption is the monthly reading of the meter. Mrs. Lavonne Thombley, the assistant office supervisor at Atlanta Gas, testified that it would not be possible to produce an accurate bill without reading the meter.

The Court will now turn to Atlanta Gas' contention that each of the three transfers may be applied by it to its most recent billings. If this contention is correct, the larger portion of the transfers would fall within the forty-five-day period after the debt was incurred and thus be protected. In support of its argument, Atlanta Gas cites O.C.G.A. § 13–4–42 (Michie 1982), which provides:

> When a payment is made by a debtor to a creditor holding several demands against him, the debtor shall have the right to direct the claim to which it shall be appropriated. If the debtor fails to do so, the creditor shall have the right to appropriate the payment at his election. If neither party exercises the privilege, the law shall direct the application in such manner as shall be reasonable and

equitable, both as to the parties and third persons, provided that, as a general rule, the oldest lien and the oldest item in an account shall be paid first, the presumption of law being that such is the intention of the parties.

Atlanta Gas argues that Debtor directed that certain amounts be credited to particular accounts, and that the payments thus appear to be intended to apply to the more recent billings.

█ Debtor's June 5, 1981, $3,000.00 payment[4] directed that $386.10 be applied to the crane division account. The $386.10 was the remaining balance due on the crane division account after Debtor's April 30, 1981, payment. The $386.10 figure includes $34.98 for gas supplied between March 30, 1981, and April 29, 1981, with the balance due having been from prior billings. Since payment was made on June 5, 1981, the payment was made within forty-five days of the date the $34.98 debt was incurred, which was April 29, 1981, when the meter was read. The balance of $351.12 is outside the forty-five-day period.

In considering subsection (c)(2), the critical date, in the Court's analysis, is April 21, 1981, which is the 45th day prior to the June 5, 1981, payment. Thus, debts incurred after April 21, 1981, would satisfy the forty-five-day period of section 547(c)(2). On April 29, 1981, when Atlanta Gas read Debtor's meter on the crane division account, $34.98 was shown to be owing, and this sum when added to the prior balance on the account of $351.12 (after deducting the April 30, 1981, payment of $825.52) resulted in a balance of $386.10 owing on the account. Since only $34.98 of the $386.10 payment on the crane division account falls within the forty-five-day period prior to the payment, it is only that sum which is protected.

█ The $2,613.90 balance of the June $3,000.00 payment was designated by Debt-

**4.** As noted previously, the Court is of the opinion that payment is considered to be made for purposes of section 547(c)(2) when the check is delivered. Since the evidence was that Atlanta Gas would credit accounts on the day the payments were received (unless payment was received after 11:30 a.m., in which case the account would be credited the next day), the Court will use the date that Atlanta Gas credited the accounts as the date of delivery.

or to be credited to the administrative division account. The administrative division account was in arrears for some time, and Debtor only partially paid the arrearage with the $2,613.90 payment. The payment corresponded to no particular billing, and the Court concludes that the presumption that the payment is to be applied to the oldest debt must apply. *See Ledford v. Sears, Roebuck & Co. (In re Williams),* 5 B.R. 706, 6 Bankr.Ct. Dec. 930, 2 Collier Bankr.Cas.2d 1216 (Bkrtcy.S.D.Ohio 1980). It also was the testimony of Mrs. Thombley that payments would be applied to the oldest bill. Thus, the $2,613.90 payment was not made within forty-five days of when the debts were incurred.

■ The July 8, 1981, $1,000.00 payment directed that $369.66 be applied to the plate division account. As of the May 29, 1981, meter reading, $369.66 was owed on that account, and the Court concludes that this debt was paid by the July 8, 1981, payment. The $369.66 figure includes $112.16 for gas supplied from April 29, 1981, to May 29, 1981, and $257.50 for gas supplied from March 30, 1981, to April 29, 1981. May 24, 1981, is the forty-fifth day before the July 8, 1981, payment, and the $112.16 debt was incurred on May 29, 1981, when the meter was read. The $112.16 thus was paid within forty-five days of the date the debt was incurred, but the $257.50 was outside the forty-five-day period since that debt was incurred at the time of the April 29, 1981, meter reading.

Debtor directed that $630.34 of the July 8, 1981, payment be applied to the administrative division account. This payment only partially paid the arrearage on that account, and the Court concludes that the payment was applied to the oldest debts in that account. Thus, the payment was not made within forty-five days of the time the oldest debts in that account were incurred.

In regard to the August 17, 1981, payment, even though Debtor directed payment to the administrative division account, that account was in arrears, and Debtor only partially paid the arrearage. Like the June and July payments to the administrative division account, the Court must conclude that the August payment to that account was credited to the oldest debts in that account. Thus, the August 17, 1981, payment was not made within forty-five days of the time the debts were incurred. Accordingly, by virtue of the June 5, 1981, and the July 8, 1981, payments, Atlanta Gas is protected in the amount of $34.98 and $112.16, or a total of $147.14, under the provisions of section 547(c)(2).

The Court now turns to section 547(c)(4). The Trustee concedes that Atlanta Gas is partially protected under subsection (c)(4). Subsection (c)(4) allows a creditor to retain an otherwise avoidable transfer to the extent that the creditor extended new value to the debtor after the preferential transfer.

■ In applying subsection (c)(4), the Court must address the question of when the preferential transfers were made, and the Court concludes that the transfers were made on the date the payment was received by Atlanta Gas. Under section 547(c)(4), the question is whether there was an extension of new value by the creditor. Section 547(c)(4) is designed to encourage transactions with distressed businesses, and, accordingly, the date of receipt of the check is controlling. *Gold Coast Seed Co. v. Spokane Seed Co. (In re Gold Coast Seed Co.),* 30 B.R. 551, 10 Bankr.Ct. Dec. 1049 (Bkrtcy.App. 9th Cir.1983); *Philadelphia Light Supply Co. v. B.R.K. Electronics (In re Philadelphia Light Supply Co.),* 33 B.R. 734, 11 Bankr.Ct. Dec. 284 (Bkrtcy. E.D.Pa.1983). Since the evidence discloses that payments to Atlanta Gas are credited to accounts on the day they are received, or on the next day if payment is received after 11:30 a.m., the Court will use the payment date entered on Atlanta Gas' itemized statements as the preferential transfer date.

In applying the subsequent advance rule of section 547(c)(4), the Court is of the opinion that Debtor's three accounts are to be considered together, and that subsection (c)(4) should not be applied to the accounts individually. The clear language of section

547(c)(4) provides that a trustee may not avoid a transfer "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor." 11 U.S.C.A. § 547(c)(4) (West 1979). It is apparent that even though each account was read, billed, and paid separately, the new value given by Atlanta Gas benefited Debtor as a business entity. Moreover, as previously noted, the purpose of section 547(c)(4) is to encourage creditors to extend new value to distressed businesses. This goal would not be served by applying subsection (c)(4) to the individual accounts.

■ The Court notes that in applying subsection (c)(4), the date the new value was actually received by a debtor must be used rather than the date of the meter reading.[5] Thus, Atlanta Gas will be protected only to the extent that it actually delivered gas to Debtor after the preferential transfers.

■ In this adversary proceeding, all three preferential transfers occurred within one of Atlanta Gas' billing periods, and the Court is unable to determine the value of the gas delivered to Debtor between the preferential transfers and the next readings of Debtor's meters. It is established that the creditor-transferee has the burden to establish the exceptions in section 547(c). *See, e.g., Waldschmidt v. Miracle Motors (In re Haynes)*, 28 B.R. 136 (Bkrtcy.M.D. Tenn.1983). Since no proof has been offered concerning the actual value of gas supplied to Debtor after the preferential transfers, but before the next readings of the meters, the Court must conclude that Atlanta Gas has not sustained its burden. The Court simply cannot determine what part of the gas delivered during that time

period is entitled to subsection (c)(4) protection.

■ The Court now will apply section 547(c)(4).[6] After the June 5, 1981, payment of $3,000.00, Atlanta Gas supplied to Debtor's crane division account gas valued in the amount of $5.27 and $4.77, for a total of $10.04. The Court is unable to determine what part of the gas supplied to Debtor's crane division account between May 29, 1981, and June 29, 1981, was supplied after the June payment. After the June transfer, Atlanta Gas supplied to the administrative division account gas valued at $162.24, $259.02, and $76.97, for a total of $498.23. The Court cannot determine what part of the gas shown to have been delivered to the administrative division account between May 29, 1981, and June 29, 1981, was delivered to Debtor after the June transfer. Finally, to the plate division account, Atlanta Gas supplied gas valued at $63.80, $88.28, and $13.01, for a total of $165.09. The Court cannot determine what part of the gas that was delivered to the plate division account between May 29, 1981, and June 29, 1981, was delivered after the June payment. The ascertainable new value extended Debtor after the June payment totals $673.36.

After the July 8, 1981, payment of $1,000.00, Atlanta Gas delivered gas to Debtor's plate division account in the amount of $88.28 and $13.01, for a total of $101.29. The Court is unable to determine what part of the gas supplied to Debtor's plate division account between June 29, 1981, and July 30, 1981, was supplied after the July payment. Atlanta Gas supplied to the crane division account $4.77 in gas after the July transfer, but the Court is un-

---

5. Subsection (c)(2) addresses when a debt was incurred by a debtor, while subsection (c)(4) addresses when the debtor received new value. Subsections (c)(2) and (c)(4) serve different purposes. Subsection (c)(4) is to encourage creditors to deal with distressed businesses, while (c)(2) is to protect normal business transactions. It thus is reasonable that Congress used "incurred" in (c)(2) and "value" in (c)(4). Debtor received "value" when the gas was delivered through the pipeline even though the debt was

not "incurred" until the meter was read. *See* 4 Collier on Bankruptcy ¶ 547.05 (15th ed. 1983).

6. For examples of the application of section 547(c)(4), see *Thomas W. Garland, Inc. v. Union Electric Co. (In re Thomas W. Garland, Inc.)*, 19 B.R. 920, 8 Bankr.Ct. Dec. 1357 (Bkrtcy.E.D.Mo. 1982); *In re Rustia*, 20 B.R. 131, 9 Bankr.Ct. Dec. 6, 6 Collier Bankr.Cas.2d 917 (Bkrtcy.S.D. N.Y.1982).

able to determine what part of the gas supplied between June 29, 1981, and July 30, 1981, was delivered after the July transfer. Finally, Atlanta Gas supplied to Debtor's administrative division account gas valued at $259.02 and $76.97, for a total of $335.99. The Court cannot determine what part of the gas supplied to the administrative division account between June 29, 1981, and July 29, 1981, was supplied after the July payment. Therefore, Atlanta Gas supplied a total of $442.05 in gas to Debtor after the July payment.

The Court cannot determine that Atlanta Gas supplied any gas to Debtor's crane division account after the August 17, 1981, payment of $2,624.75. Gas valued at $13.01 was supplied to the plate division account after the August payment. The Court cannot determine what part of the gas supplied to that account between July 30, 1981, and August 31, 1981, was supplied after the August payment. Finally, Atlanta Gas supplied gas valued at $76.97 to the administrative division account after the August transfer. The Court is unable to determine what part of the gas supplied to the administrative division account between July 29, 1981, and August 28, 1981, is entitled to protection. Therefore, of the $2,624.75 August payment, $89.98 is protected under section 547(c)(4).

Thus, Atlanta Gas received a total of $6,624.75 in preferential transfers. Atlanta Gas is entitled to the protection of section 547(c)(2) in the amount of $147.14 and the protection of section 547(c)(4) in the total amount of $1,205.39. Therefore, Atlanta Gas' total protection is $1,352.53.[7] The Trustee is entitled to recover $5,272.22.

■ The final issue to be decided by the Court is whether a set off may be effectuated by reducing the disbursement of Atlanta Gas' administrative expense claim of $12,823.82 by the $5,272.22 recoverable by the Trustee. 11 U.S.C.A. § 502(d) (West 1979) provides:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

In this adversary proceeding, the payments found to be avoidable preferences under section 547 may be recovered by the Trustee from Atlanta Gas through the provision of section 550(a), 11 U.S.C.A. § 550(a) (West 1979). Thus, section 502(d) applies in this adversary proceeding. Collier on Bankruptcy notes:

> Section 547 is the preference section of the Bankruptcy Code. Section 548 deals with fraudulent transfers and section 549 deals with postpetition transfers of the debtor's property. To the extent that transfers of property fall within the reach of these sections, the transferee, as a creditor asserting a claim, may not have that claim allowed unless that creditor has paid the amount of the transferred property or turned over the property itself....

3 Collier on Bankruptcy ¶ 502.04 (15th ed. 1983). Section 502 was not designed to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with the other creditors. *Id.*

The fact that Atlanta Gas' claim is for an administrative expense has no bearing. Several courts have addressed this issue

---

**7.** The legislative history of section 547(c) states: "Subsection (c) contains exceptions to the trustee's avoiding power. If a creditor can qualify under any one of the exceptions, then he is protected to that extent. If he can qualify under several, he is protected by each to the extent that he can qualify under each." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6329; S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5874.

under section 57g of the Bankruptcy Act.[8] In *Weber v. Mickelson (In re Colonial Services Co.)*, 480 F.2d 747 (8th Cir.1973), the court held that even if a claim was for a priority administrative expense, section 57g precluded allowance of the claim until the repayment of preferential transfers. Also, in *Hudson Feather & Down Products, Inc. v. B & B Associates, Inc. (In re Hudson Feather & Down Products, Inc.)*, 22 B.R. 247 (Bkrtcy.E.D.N.Y.1982), the court held that preferences had to be surrendered and could not be set off against claims arising during the administration under Chapter XI even though such a set-off would not affect the return to the bankrupt's other creditors. *See also Gander Mountain, Inc. v. Impact Industries, Inc. (In re Gander Mountain, Inc.)*, 29 B.R. 260 (Bkrtcy.E.D.Wisc.1983) (under the Bankruptcy Code creditor not entitled to retain preferential transfers in amount creditor would receive under reorganization plan).

In light of the above, the Court is of the opinion that Atlanta Gas is not entitled to set off its award of an administrative expense against the preferential transfers recoverable by the Trustee.

The Trustee has requested that costs of this adversary proceeding be taxed against Atlanta Gas. Since the Trustee has shown no basis for such an award, the Trustee's request for costs must be denied.

An order in accordance with this opinion is attached hereto.

### ORDER

Upon the attached and foregoing findings of fact and conclusions of law; it is

ORDERED, ADJUDGED AND DECREED that the preferential transfers by Georgia Steel, Inc., d/b/a Eastern Crane & Equipment, d/b/a Plate Services, d/b/a Georgia Structurals, and d/b/a Quickwork, Debtor, in the amount of $5,272.22 to Atlanta Gas Light Company, Defendant, are hereby avoided; and it is further

ORDERED that J. Coleman Tidwell, Trustee, Plaintiff, have judgment against Defendant in the principal amount of $5,272.22 with interest thereon at the legal rate from the date of this judgment until the judgment is satisfied; and it is further

ORDERED that the request of Plaintiff for costs to be taxed against Defendant is hereby denied.

### APPENDIX A
#### Plate Division Account

Gas Supplied
To Debtor

| From: | To Date of Meter Reading: | Cost of Gas for the Period: | Date of Payment: | Amount Paid: | Balance of the Account: |
|---|---|---|---|---|---|
| 3–30–81 | 4–29–81 | $ 257.50 | | | $ 2,903.26 |
| | | | 4–30–81 | $2,645.76 | 257.50 |
| 4–29–81 | 5–29–81 | 112.16 | | | 369.66 |
| 5–29–81 | 6–29–81 | 64.79 | | | 434.45 |
| | | | 7–08–81 | 369.66 | 64.79 |
| 6–29–81 | 7–30–81 | 63.80 | | | 128.59 |
| 7–30–81 | 8–31–81 | 88.28 | | | 216.87 |
| 8–31–81 | 9–03–81 | 13.01 | | | 229.88 |

**8.** Section 57g of the Bankruptcy Act provided: "The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances." Law of July 1, 1898, ch. 541, § 57g, 30 Stat. 560 as amended (repealed 1979). Section 502(d) of the Bankruptcy Code basically tracks section 57g of the Bankruptcy Act. 3 Collier on Bankruptcy ¶ 502.04 (15th ed. 1983).